Good morning, your honors. May it please the court, Nathaniel Garrett for the defendant, Gale Joseph Young. I intend to save three minutes for rebuttal, but I'll watch my own time. Your honors, in our briefs we identify several errors that independently warrant reversal of the jury verdict and sentence in this case, but I'd like to focus first this morning on the important and unsettled question of first impression presented in this appeal, which is whether low-copy DNA evidence is sufficiently reliable under the standard for admission as evidence of guilt in a federal criminal proceeding. The district court found that Mr. Young's objection to that evidence went to weight rather than admissibility. Well, the problem is that it's hard to know, to clear away the smoke to get at that issue in this case, because the major dispute seemed to be whether that happened or not. Well, it's certainly the threshold issue that we need to grapple with, but what you have is on the one side, Mr. Harmer, the government's expert saying he did not conduct LCN testing, and everybody else saying he did, and saying that that opinion is not consistent with the literature. So to set the stage here, Mr. Harmer took 600 picograms of DNA from each side of the baggie, and the testimony was that 200 picograms is the threshold for low-copy DNA. Now, Mr. Harmer said what matters is the total amount that I test, but on that day, he was contradicted by every other expert in the case, including the affidavit submitted by the government on behalf of Dr. Boodle, who were at ER. All right. But then there was a hearing. There's a procedural thing that confuses me. There was an in-person hearing, and the defendant didn't put on any witness. So what do we have? Are all these declarations still relevant to contradict what Mr. Harmer said in person? I think they are, Your Honor. I think they are. I mean, this is the – there was a number of written submissions to the district court before the hearing, which set forth the reliability. Based on that, she called the Daubert hearing, and then you had Mr. Harmer. But I think that absolutely the submissions that were made in writing go – So where – where – she held a hearing. She considered the affidavit. So where did she go wrong? Well, I think she went wrong on two respects, Your Honor. Number one is that she said she was going to – Judge Chesney said she was going to examine the testimony and the evidence under the Daubert standards, but then she really didn't apply the four factors that Daubert uses. She said she considered the Daubert factors. She said she was going to consider the Daubert factors, but then we don't see an analysis of those factors. What you have is her relying on Mr. Harmer's testimony that what he was doing was reliable. Because if she considered them, should we assume that she actually considered them and thought about them and – That's a hard question, Your Honor. I don't know, because the problem is there's nowhere in the hearing where she explains how those factors should be applied here. More specifically, did Judge Chesney resolve the question of whether LCN DNA testing occurred here or not? No, I don't think she did. Did she make any determination that the results of those tests or any other tests that were conducted or the expert's testimony was reliable? I think she made a determination that based on what Mr. Harmer had testified to, she had faith in his results, in the reliability of his results. I thought Dr. B, who you say agreed that he had done improper LCN testing, it looks to me when I read his report that his ultimate decision is, well, that's one thing to consider, the 200, but the other thing to consider is the peaks. And he didn't violate that part. And I don't – as I recall, his – I think his ultimate conclusion is not, you invalidly did LCN testing. But you just said a moment ago that the doctor agreed that he had done Dignati. I think he did agree that LCN testing was done here, Your Honor. If you look at ER51, the question was whether in a mixture – and this – by the way, this is the issue that was addressed in the McCluskey opinion, which we cited recently in a 28-J letter, whether in a mixture you look at the amount of DNA that can be attributed to a particular individual, whether you look at the total amount of DNA. And McCluskey agreed you look at the individual amounts. And Dr. Boodle says the same thing. He says if the sample is composed of two or more individuals, i.e., mixture, then it's possible that some contributors, often called minor contributors, may be at LCN levels, even though the total amount of DNA is well above the LCN initial DNA level. And then he goes on – this is the part I really didn't understand. Because he then goes on and says, but there's no problem here because Young was by far the major contributor and was well over the amount, and I thought that the evidence was the opposite. It is, Your Honor, and that's what I don't understand either, is that Mr. Harmer admitted during the trial that he was not the major contributor. And he also testified that as to side one of the baggie, there was approximately 100 picograms of male DNA compared to 500 picograms of female DNA, and then on side two, 60 picograms of male DNA compared to 540. So – Do you read Dr. Bolwer's affidavit as being confused about that? I think it is, yes. I do read it as being confused. And I read it as – it's a rather obtuse document, and I've spent a lot of time going through it. I mean, what's rather odd about it is he makes that statement. He makes the statement that there is LCN testing going on here. He makes the further statement that he sees certain LCN results here, both stutter and allele dropout. And then he says you can redo the statistics anew and come out, and he has confidence in it. Well, what he says is you can do the statistics again and you can't rule out Mr. Young as the contributor of the DNA. But what I think is perhaps most interesting about the affidavit is what he does not say, and perhaps what he was not asked by the government to opine on, which is under these results, he can't exclude Mr. Young as the contributor, but is it sufficiently reliable, those results, to have trust in them as evidence of guilt? And the FBI, if you look at ER-26, the FBI says this is exactly what LCN testing cannot be used for. They make the point that traditionally, DNA evidence is used for exculpatory purposes. In other words, you take the DNA of the suspect, you take the DNA off a piece of evidence and you compare them and you make a determination, can we exclude this person as the source or not? The FBI says you can't do that with LCN testing. You can't do that because the whole point of HCN testing, of normal STR analysis, is you don't capture every piece of DNA on a piece of evidence. And that's at SER-327. What Dr. Ford explains is these tests are designed not to capture everything, but only to capture the evidence you can have faith in. That's why they require 1,000 to 2,000 picograms of DNA. That's why they require 28 cycles. That's why they set a certain match interpretation threshold. And in every way, this test was designed to short-circuit that safety net and was designed to capture these low amounts of DNA and to present them as evidence of guilt. What is our review standard, is it abuse of discretion or error or what? Yeah, it's abuse of discretion and again, I've thought a lot about that. The sort of odd application here is, I think in a situation where the district court went through the Daubert factors and applied them and explained them, then I think you do apply abuse of discretion to that analysis. But where you don't have that analysis, it's a little more complex to apply an abuse of discretion standard. I think if the Court agrees with us that she didn't actually I think Daubert gave the district court judges quite a bit of leeway in how they go about making a reliability determination. They're just not stuck with the factors that are enumerated. I think as a general proposition that's true, that the four factors outlined in Daubert aren't set in stone, you can consider other things. But there are two things I should say about that. Number one, she said those were the factors she was going to consider and be guided by and we submit she wasn't. And number two, Daubert still does have a limit, at least this Court's opinion on remand in Daubert does. And what it says is, when an expert's testimony is based on a test that was not conducted pre-litigation and hasn't really been subjected to peer review, you can rely on that expert's testimony so long as that expert is pointing to some objective source, whether it be a peer-reviewed article, a professional association statement, that confirms they are doing the test in a way that's accepted by at least a recognized scientific majority. That's what the Daubert opinion says. Here you have Mr. Harmer saying my test is reliable and yet he didn't do LCN testing. He admits he didn't do any of the things you typically see labs do when they do LCN testing. Perhaps most important of which is he didn't do the test more than once. And as the McCluskey opinion notes, that's really the core feature of LCN testing. You do it more than once and you only consider those results that match up. So he didn't change anything. So I think it does go back to Judge Berzon, your point that the threshold question is very important. Because if you get past that and you agree, and let me provide some sites as to all the individuals who contradicted Mr. Harmer on that point first. It wasn't just Dr. Boodle, it was Dr. Ford at ER19, it was Dr. Crane at SCR352, and I would look particularly at Dr. Crane. He explains why this makes sense that you, in a mixture, what you're looking for is how many, how much DNA can be attributed to an individual. His point is, look, you're testing particular alleles. That's what you're testing. And so if those alleles from a particular individual are below the low-copy amount, you're going to see all the problems you see with low-copy testing. So it doesn't matter if you have 500, 1,000, 2,000 picograms of DNA from somebody else. That's not going to cure the reliability problems associated with the DNA from that one individual. So if you get past... I have absolutely no understanding of this. Okay. But in terms of, just to try and conceptualize it. When you're testing, if you have 500 picograms, is that what they're called? Yes, ma'am. If you have 500 picograms, and it's mixed people, do you test all 500, or did he test all 500, or did he try first to extract Mr. Young's DNA? The former, Your Honor. He had more DNA at his disposal. In fact, we probably could have avoided the problem entirely. But he took 600 out of 11,000 and 7,000. So that's the amount he decided to test. And then he did not attempt to extract Mr. Young's DNA. The only thing he can do is tell us that Mr. Young is far and away a minor contributor to this DNA. He can't tell us... I mean, the other thing that's disturbing here, though, is there's no counterpoint, meaning the defendant didn't put on any live witnesses and didn't have any other testing done. And presumably, they could have had somebody else do testing by whatever method they thought was the right method, if there is one, but they didn't do it. Well, I'm not going to say it couldn't have been done better, Judge Berzon, but I do submit that based on the written evidence that was submitted, the evidence was that the FBI and other experts in the field believe LCN testing is not sufficiently reliable. And Mr. Harmer really didn't contradict that. His point was, I'm not doing LCN testing. So if you get past that, you really don't have a dispute in the evidence about the reliability of LCN testing. And I'm getting down my three minutes, so if it's all right, I'll thank you. Yes. Good morning. May it please the Court. Susan Gray on behalf of the United States. The defendant has raised four issues, but he's addressed only one here, so I'm going to focus my attention on the DNA and hope that if the Court has any questions on the other remaining three issues that I'll answer them. The record reflects that the district court properly exercised her discretion. She recognized in terms of admitting this DNA evidence, first, she recognized the issue, was it low copy number DNA, and whether it was reliable. She recognized that. Well, she said that at the beginning, but she never resolved it, did she? Your Honor, she didn't have to, because her job was to determine whether or not this was reliable. And what she had before her were speculative declarations from the defendant's experts saying this might be, it may be. If you look at ER 19, which is Ford's declaration, he says the term LCN may apply to the minor mixture if the minor contributor falls below the stochastic threshold. Crane says at ER 59, it may be that no guidance is given on these speculating about their procedures, or it may be their protocols don't provide the guidance. And then at ER 2829, he admits that he doesn't know whether the stutter ratios observed at 28 versus 29 cycles. So this was speculation. And in contrast, the district court had before it a declarative statement from Mr. Harmer, who'd actually conducted the testing, saying I didn't do LCN testing. And Dr. Brown ---- I mean, isn't ---- I mean, it struck me reading the New Mexico opinion and reading the record here that it, just on a very lay basis, as I say, I don't know anything about this otherwise, that it isn't very logical to say that you look, you don't look at the amount of DNA from him. You look at the larger amount of DNA. And on that, the other witnesses in their declarations are pretty clear, aren't they? Well, Your Honor, they speculate that that could cause problems. But there's no indication it caused a problem here. And that's why the court admitted this is reliable, because ---- Because the total amount of DNA from any individual contributed to a sample is what is important, essentially the opposite of what Mr. Harmer, Alpine, said. And that was the core of his ---- I mean, if you take that out of his analysis, of Harmer's analysis, then it can't be true that this isn't LCN analysis. But, Your Honor, the court, in assessing this, recognized there was disagreement about whether or not you could take it out or not. But the only thing she had ---- Resolved that? Pardon me? Did she ever resolve that? No. Well, she resolved it in Harmer's favor when she credited his testimony and found it reliable. And one thing that she had ---- Talk about ---- I mean, her now ---- I mean, if you compare ---- I have the enormous respect for Judge Chessie, but I suspect that she was as at sea as I feel here. And, therefore, she ---- if you compare her analysis to the one that went on in the District Court of New Mexico, there's not a lot of comparison in terms of the ---- I mean, she didn't really resolve much of anything. Actually, I disagree, Your Honor. And on the record before her, she had ---- she found his testimony reliable. And she said, I understand that people disagree about how you define it. But what she had on the record before her was speculation. And what she had is Dr. Badouli, the recognized expert in the field, saying there are two parameters for low copy number, and it doesn't fit here. And it doesn't fit because Mr. Harmer said, I tested over 500 to 600 picograms. But, moreover, I test LCN on a daily basis. And this wasn't LCN. I take ---- you do it first looking at the amount of input, but then you also, Dr. Badouli, ER51 says, the threshold for whether or not this is LCN needs to be determined within the laboratory through proper validation studies for each system employed. And those two parameters are the starting amount of the DNA, which here was clearly over 500, and secondly, the final amplified DNA product yield. So what you look for in that situation, so is it the beginning or the end? And Dr. Badouli says, you do ---- you look at both. You look at how much you start with here, clearly over LCN, and you look then at the analysis that you do at the end. And if he says in his declaration that if it's low copy number, you should see a complete fallout of the stochastic effects. Everything should be below 150. And he says that didn't happen here. And Harmer says the same thing. It didn't happen here. What was Judge Chesney referring to in her ruling, her ruling from the bench, when she says he, she's referring to Mr. Harmer, she says he has even conceded that you could call this low number copy or low copy number. And if you do, why it doesn't matter because he has, again, he in essentially late terms has been over backwards to come up with a result that would be skewed by any low copy number analysis. What is she talking about? I think she was talking about, Your Honor, the fact that on cross-examination he was questioned about, well, some people say this. You know, he was cross-examined about Crane's statement about whether it was 60 or 50 or what you ---- whether it's the starting amount or it's the analysis that determines whether or not it's low copy number DNA. And he said some people think it's the starting amount. But what he went on to say is, one, I didn't start with low copy number, but, moreover, I didn't count anything below the 150 threshold. And this goes to your question, Judge Berzon. In this instance, the Court had not only Harmer's, not just assurances, but a detailed explanation of his methodology and how it had been externally and internally validated. But then the Court had a second barometer of reliability, and that was that Dr. Badouli, the recognized expert in the field cited throughout these articles submitted by the defendant, came in and looked at the same material and said, he's not a minor contributor. My question about his report, where he said that it seemed, as I understood the record, that everybody agreed that Young's DNA was a relatively small portion of this 500 picograms or whatever, and he said it was the major portion. I didn't understand that. Your Honor, I think I have to fall back on what Judge Chesney said. There's a reason we all went to law school instead of medical school when she was confronting this very issue. But what he did is, as best as I understand it, is that he took a look at the materials provided that explaining Dr. Harmer's methodology and said, no, he's not a minor contributor, he's a major one. And he did that based on an analysis, a statistical analysis. So the evidence before the case was that he was a minor contributor, and he was a major contributor. And I'm not one of the things he examined, but I'm not positive about that. To address the Court's question about whether you – this was reliable, the court – the district court did conduct a detailed Daubert hearing. She clearly, from her – she did not simply accept Mr. Harmer's conclusions or assurances. Instead, it was clear – That's what it looks like, though. I mean, I don't see her making a clear reliability finding. Well, actually, Your Honor, I think she does when she's –    I don't see her making a clear reliability finding. And if you rest on the good faith effort of the – of those in this community, that they're trying to work through these issues, and his – and Harmer's method was – fell within that range. No, Your Honor, I disagree. And I think that's – it's – it – it – what's telling is about when those She sat through – she's clearly read the declarations because she's then asked probing questions of Mr. Harmer. You know, and it – it's really more in – not simply, is it – is this what you're telling me is true? It's – you can almost hear her thinking out loud, is – is it my understanding, is it correct that you treated this conservatively? Is it my understanding that this is what your testimony is? She's confirming, and then she goes on to say, it's clear there's some disagreement here. But he has gone out of his way to make sure that his results were not skewed by any low copy number testing. And I do want to follow up on one point, and that is, Dr. Badouli found that this was – It sounds like then he was operating under the notion that there was low copy number testing in play. No, I think when he says he – In my – in my – see, I couldn't understand. She says he has even conceded that you could call this low copy number. What – what – that's what I'm trying to figure out. Where does she – where does that come from? I think that's a follow-up, Your Honor, to the fact that on cross-examination, Mr. Harmer's asked, well, confronted with what Mr. Ford said or what Mr. Crane said. And he said, well, some people do, I don't. And that – so she – he – she, I think, was crediting the fact that this – this expert was saying, yes, there's an honest disagreement, just as in this Court's And the same sort of criticisms of the methodology were made. The FBI wasn't using accredited procedures. The jail wasn't appropriate. And the Court found there that, no, the district court – Barron, the Badouli declaration, you said that he addressed the question of why he considered Young to be a major rather than a minor contributor. Where is that, as opposed to assumed it? Your Honor, I don't have a specific answer to that because he – he does – It's not in here. He – he – well, I think what he did, if you look at him, his – his letter, he says that you look at two – two different products, you know, or two different issues, and that is the starting amount and the final amplified DNA product. And when he looked at the final amplified DNA product, he said, I don't need to count any of the problematic low copy number aspects that Harmer may have counted. Because there is a clear major component that is well above the LCN level and well resolved from the mining component, and Young cannot be excluded as a possible contributor of the major component. And the problem is that everybody else seemed pretty clear about the fact that Young was not the major component, he was the minor component. Your Honor, I think it's very confusing, so it's therefore very hard to – to figure out what he's talking about. Well, the question is, Your Honor, whether the court, the district court, having been there, having been able to hear Dr. Harmer's testimony and evaluate Dr. Boulid, the question is whether or not this court has to have another Galbert hearing here today, based on this record. Well, the question, I guess, is whether we can have confidence in Judge Chesney's analysis, given how little she's said. Yes, Your Honor, and you can because – in part because there was nothing to contradict her conclusion that this was reliable. She didn't notice this problem, so she didn't resolve it. Well, Your Honor, I do want to clarify one point in the record, is Dr. Boulid found he was the major, and he also made some criticisms about Harmer's evaluation of the analysis, and when Harmer took the stand, the only person to take the stand because the defendant put on absolutely no one, he said, to the extent that Dr. Badouli thought that there were aspects of low copy number analysis in my work, he was wrong because, I think it's at ER 138, I didn't count any. But he also said definitively that the ratio of female to male DNA was 6 or 7 to 1. And that – and that Ryung was something like 60 picograms out of the 500. So that's why I can't understand what Badouli is talking about. Your Honor, my reading of the letter, and I am no scientist, is that he is talking about the statistical analysis rather than the actual amount in. But I do want to go back to this issue of whether you look at just the male portion, because the evidence before the court was not – did not contradict Harman. And because Crane at SCR 363, paragraph 1, says the – in determining low copy number, it is the starting amount, the amount of starting DNA, if there's enough starting amount prior to when the whole process starts. So he doesn't contradict Harman in the sense that, look, what you – when you're talking about 200 picograms, that's what you look at. But, Your Honor, to step back for a moment in terms of the reliability analysis, the court here conducted that Daubert hearing and found that not just based upon his assurances, but based upon the specific methodology detailed. And to confirm the reliability of his results, Dr. Badouli came in and said, look, I can confirm that he cannot be excluded. There is nothing in the record to support that Young's DNA was not on both sides of that baggie. Furthermore, even if this Court was going to conclude that the district court erred in admitting this evidence, it was harmless. The expert was subject to cross-examination, extensive cross-examination by defense counsel on both the methodology and also on contamination. And secondly, as I mentioned, there was nothing in the record to refute that Young's DNA was on the bag. Third, it was one of only three types of evidence tied to the defendant in the bag. And let's remember, the defendant's not challenging the fact that he admitted he was at the police station that day, he carried the crack cocaine in his buttocks, that he wasn't – the police didn't find it, and that he possessed it for the purpose of sale. That is uncontradicted in the record. Finally, to the extent that the defendant now challenges the district court's analysis, at ER 149, at the conclusion of this hearing, the court said, I can hear further from counsel, but my initial impression is this is a question of weight, not admissibility. And defense counsel says, I think the court's statement of the analysis is correct. And that was cited to the court at page 38 of my brief. This case is very similar to the Chiseli case, where the court had before it a difference in opinion about what LCN was, but the court found that it credited the testimony of Mr. Harmer, and there was nothing to contradict that. The defendant put nothing on. The defendant here would – the appellate would like this Court to make a determination that LCN DNA testing is unreliable. This is not the case to do it. It is not the record to do it on it, where none of these defendants' experts have been subject to cross-examination. Kagan. I agree that those experts, however – I mean, my understanding – I'm not sure I have an understanding. What is the situation with regard to the status of the declarations? Are they in the record for these purposes, and do we consider them? I'm sorry. You're all right. The declarations which – of the witnesses that did not appear. My understanding is that there was an agreement or a ruling by the judge that she would consider those, at least at this point. She did consider them, Your Honor, so they are part of the record, but I would urge the Court to remember that they're untested. The defendant didn't – the government did not get a chance to test those conclusions or those statements at all, and at most, they are speculative, that this procedure might have been at fault or that procedure might have been at fault. So there may come a time and place when the Court wants to rule on whether low-copy number testing is reliable or should be admitted, but this is not the case to do it. This – as I noted in my most recent 28J letter to the Court, the district court in Resolus Ramos recently – that was just argued to the Court on March 13, 2011 – considered the same issue and also was faced with the same, if you will, false premise that LCN DNA testing had occurred, and there the district court found that it had not. So that – that issue has been argued to the Court and is pending. Okay. Thank you, Your Honor. Thank you. All right. With three minutes, I've got a couple goals. One is to clear out two pieces of underbrush and then make three points. One piece is, Judge Pais, you were asking why Judge Chesney might have said that Mr. Harmer conceded there was low-copy DNA. I suspect she's talking about a statement on ER 116 where he's asked, do you disagree with Dr. Badoli's conclusions in terms of there being a low-copy component in this test? And he says, you know, I kind of disagree. My gist is I put in an adequate amount of DNA. If they want to try to separate the male component, that's fine. I can see their point. So I think that's probably what she's referring to. Judge Berzon, the continuing confusion that I share over Dr. Badoli's point that he was the major contributor, I'll just direct the Court to ER 848 and 934. Those are both places where Mr. Harmer, during the trial, says Mr. Young was at most the major contributor. So I think they're inconsistent on that front. And how do we – what's his name? Pardon? Badoli. Badoli also says – he says definitively that it's the individual's DNA and not the aggregate. That's correct, Your Honor. That's correct. All right. Three points. Number one – Everybody says that except maybe Harmer. I'm sorry. I didn't hear you. Everybody in the record says that, except Harmer. Yes, other than Mr. Harmer. That's exactly right. Number one, this quote – this court in Daubert said the court may not, quote, rely entirely on the expert's unadorned assertions that the methodology they employed comports with standard scientific procedures. I think if we could boil it down, that's our main point about Judge Chesey's analysis, that she essentially accepted Mr. Harmer's testimony that was reliable. The second point I want to make – this is LCN testing, and I'm vexed by the argument that our experts said anything differently. If you take a look at SCR 326, Dr. Ford says, based on series-owned data, Mr. Harmer's samples fall below the low copy number threshold with regards to the male contributor. I'm not sure what more he was supposed to say. And there was also a suggestion that Dr. Crane somehow agreed with Mr. Harmer on the notion that what matters is the total amount of DNA. He says the total amount of DNA from any individual contributor to a sample is what's important, essentially the opposite of what Mr. Harmer opines. He was directly contrary to him on that point. And last point, and this is very important, it's complicated, I accept that, but there is substantial evidence in this case that you have exactly the type of low copy problems that you worry about with DNA. There are four problems. Three of them were noted in McCluskey. Number one, Mr. Harmer says at EO 107 to 108 that if two alleles are out of whack, in other words, more than 70 percent separated, then you've got a stochastic problem. I've put in red that... And Harmer seems to deal with those problems by manipulating, by saying he manipulated the statistics or he looked at, which is what the judge says was bending over backwards, and you would say what? No, it's a totally different point. I think what the government wants to say is, look, the only stochastic effect we're worried about here, and my time is up, but I'd like to answer your question, the only stochastic effect we're worried about here is whether the DNA falls below the, quote, match interpretation threshold of 150. That's absolutely wrong, Your Honor. That's one problem. That's called allele dropout, where the alleles fall below 150. By the way, you have that on five or six occasions here. Exactly one of the problems McCluskey notes, so how can you trust the other results? But you have them, but there are other... And so Mr. Boodle says, it's kind of crafty, actually. He says, I've actually taken care of this problem because I'm not considering those allelic dropouts. Well, by the way, most of the alleles that dropped out didn't match Mr. Young, so what you get is actually a higher likelihood that it's Mr. Young's DNA in his opinion by excluding those. But more than that, there are other problems that you see here. He says, Mr. Harmer says, stochastic effects includes when the alleles are out of whack more than 70 percent. So if I had an allele 12, an allele 13, and I put a substantial amount of DNA on a piece of evidence, you'd expect to see those in pretty similar amounts, because I submitted both. When they're more than 70 percent out of whack, that's a problem, because then why are you seeing that out of whack? McCluskey, there was one example of that in that case, and that was one of the reasons it excluded it. I circled in red all the examples. I would say there's a dozen to 18 to 24 examples where that's a problem in this test. And Mr. Harmer himself said that was a stochastic problem. And he also said, and finally, Dr. Budoli on ER51 says he sees Scudder, which is a third stochastic effect. So you have at least three stochastic effects and the fact that he didn't retest this evidence. All of those, or three of those reasons are in McCluskey why they excluded it. It's the same case here. Okay, thank you, counsel. We appreciate your argument. Thank you, Your Honor. Interesting case. Thank you.
judges: Fernandez, Paez, Berzon